**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

|  |  |  |
|---|---|---|
| **ROBERT SUMMERSGILL, NAMED** | ) | |
| **PERSONAL REPRESENTATIVE OF THE** | ) | |
| **ESTATE OF JEAN SUMMERSGILL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 13-cv-10279** |
| | ) | |
| **E.I. DUPONT DE NEMOURS & CO.,** | ) | |
| **BENEFLEX MEDICAL CARE PLAN AND** | ) | |
| **MEDICAL CARE ASSISTANCE PROGRAM,** | ) | |
| **AND AETNA LIFE INSURANCE CO.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
_____ )

## MEMORANDUM AND ORDER

CASPER, J.                                                                January 6, 2016

### I.   Introduction

Plaintiff Robert Summersgill, representative of the estate of Jean Summersgill, ("Summersgill") brings this action against Defendants E.I. du Pont de Nemours and Company ("DuPont"), Beneflex Medical Care Plan and Medical Care Assistance Program, and Aetna Life Insurance Co. ("Aetna") (collectively, "Defendants") under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq*. ("ERISA") alleging that Defendants improperly denied his late mother, Jean Summersgill ("Mrs. Summersgill") reimbursement for certain care she received at a Christian Science facility. Defendants and Summersgill have moved for summary judgment. D. 88; D. 92; D. 94. For the reasons set forth below, Defendants' motions for summary judgment are ALLOWED and Summersgill's motion for summary judgment is DENIED.

1

## II.   Background

### A.   The Plan

The following facts are drawn from the administrative record[1] submitted to the Court by DuPont, D. 105, Summersgill's statement of material facts, D. 89, Defendants' response, D. 102, and Defendants' statement of material facts,[2] D. 96.

Mrs. Summersgill, as the surviving spouse of Elmer Hibbard Summersgill, received health benefits under DuPont's Medical Care Assistance Program ("Plan"), described in the Summary Plan Description ("SPD").  D. 96 ¶ 1; D. 102 ¶ 2.[3]  DuPont serves as the Plan Administrator and Aetna, through an Administrative Services Agreement with DuPont ("Administrative Agreement")[4], D. 98, and as outlined in the SPD, AR 687, 695-96, is Claims Administrator and medical carrier, AR 696.  As such, Aetna initially reviews and manages the claims for benefits

---

[1] All references to the administrative record shall be "AR."

[2] Summersgill did not file a statement in response and Defendants' material facts, to the extent they are uncontroverted, are deemed admitted for purposes of the motion.  See D. Mass. Local R. 56.1; Zimmerman v. Puccio, 613 F.3d 60, 63 (1st Cir. 2010).

[3] Summersgill names the Beneflex Medical Care Plan as a Defendant, but no party contests DuPont's assertion that Mrs. Summersgill participated in the Medical Care Assistance Program, not the Beneflex Medical Care Plan.  D. 95 at 17.  The SPD does identify both plan names on its front cover, but states that "[i]n the event of a discrepancy between this SPD and the Plan document, the Plan document will govern."  AR 645.  Accordingly, the Court reads the Plan and SPD together, to the extent they do not conflict.

[4] Summersgill disputes the admissibility of the Administrative Agreement because it is not included in the administrative record.  D. 100 at 1-2.  Summersgill, however, does not explain how he is prejudiced by the admission of the Administrative Agreement when no party disputes its existence or contents.  Id.  Accordingly, the Court considers the agreement in deciding the pending motions.  See, e.g., Daniel v. UnumProvident Corp., 261 Fed. Appx. 316, 318 (2d Cir. 2008); see also Young v. Aetna Life Ins. Co., 88 F. Supp. 3d 11, 14 (D. Mass. 2015) (considering a plan's undisputed discretionary language not in the administrative record despite plaintiff's lack of prior notice because there was no prejudice to plaintiff).

which DuPont ultimately pays.  D. 98 at 2-3, 8; AR 685.  Under the Plan, DuPont has full discretion and authority to interpret Plan provisions, resolve any ambiguities and evaluate claims.  AR 635. DuPont decides the "final appeal" for any claim denied under the Plan.  AR 635, 687; D. 95 at 3. In making such a determination "with regard to whether a particular treatment, drug or other item is . . . not medically necessary or appropriate, [DuPont] shall consult with a health care professional who has appropriate training and expertise in the field of medicine involved in the medical judgment."  AR 688.

To challenge a determination of benefits, a beneficiary of the Plan, after receiving written notice from Aetna of the denial or partial denial of a claim, first contacts and appeals to Aetna (what the parties refer to as a "Level 1 appeal").  AR 686-87.  If the claim is not adequately resolved with Aetna and Aetna denies an appeal, a beneficiary may then make a final appeal to DuPont (a "Level 2 appeal").  AR 687.  An appeal to DuPont must be made in a timely manner, preferably 60 days after a claim is denied.  Id.  Depending on the circumstances, DuPont will provide information regarding a final decision within 60 days.  Id.  The Plan requires exhaustion of the "claim and appeal procedure . . . before seeking any other legal recourse regarding claims for benefits."  Id.

The Plan, subject to certain exclusions, pays covered expenses for a "Christian Science Facility - unlimited days for room and board and nursing care in lieu of inpatient hospital care." AR 626; see AR 671.  "Inpatient" is defined in the SPD as "[w]hen you are admitted to the hospital for treatment or observation."  AR 699.  The term "hospital" is defined as:

> An institution which is primarily engaged in providing for compensation and on an inpatient basis, for the surgical and medical care, diagnosis and treatment of persons through medical, diagnostic and major surgical facilities. These facilities must be

provided on the institution's premises, under the supervision of a staff of physicians and with twenty-four-hour-a-day registered graduate nursing services; or

An institution which is accredited as a hospital by the Joint Commission on Accreditation of Hospitals, or which the Contract Administrator designates.

The term "hospital" shall not include any institution (or any part of an institution), which is used other than incidentally as a convalescent facility, nursing home, rest home, or a facility for the aged.

AR 617.

The Plan specifically excludes certain services and supplies from covered expenses:

- Charges for services or supplies not medically necessary for the diagnosis and treatment of the illness or injury, except for preventative procedures described herein;
- Charges for services or supplies specifically to maintain a level of well-being, and;
- Charges for custodial care, regardless of who recommends or provides the care.

AR 627, 683-84.  Notably, the SPD states—in describing covered services, including those

provided at a Christian Science facility—that "[a]ll care must be medically necessary."  AR 670-

71.  "Medically necessary" is defined as:

a service or supply, which is reasonable and necessary for the diagnosis or treatment of an illness or injury, in view of the customary practice in the geographical area, and is given at the appropriate level of care.

AR 617, 699.  "Custodial care" is defined as:

treatment of persons who have reached the maximum level of recovery which can reasonably be expected, or care primarily for purposes of meeting a person's needs which could be provided by persons without professional skill or training.

AR 617, 698.

### B.  Mrs. Summersgill's Care and Claims

From June 2008 through December 27, 2012, Mrs. Summersgill, an elderly woman and

life-long Christian Scientist, D. 102 ¶ 1, received Christian Science care at Chestnut Hill

Benevolent Association ("CHBA"), id. ¶ 5. According to CHBA's records in 2010, Mrs. Summersgill received most care in bed and was "[c]hallenged with weakness, sudden needs when [she] has become unresponsive and stopped breathing;" "[d]ifficulty with nourishment due to difficulty chewing and swallowing," requiring assistance for feeding; "pain in back, head, neck and legs when moving and turning" and "[d]ifficulty with moving head," requiring assistance; limited mobility and range of motion in neck and legs; "[d]iscomfort in knees; needing support," and; difficulty with communicating, "orientation and assimilation." AR 56. In June 2012, CHBA indicated that:

> quite a few times over the past couple of years, and especially is the last year, there have been instances where the patient has been challenged with an obvious change of temperature, vomiting and/or extreme slowness of breath or irregular breathing; in each of these instance, they have responded by engaging Christian Science treatment from a Christian Science practitioner immediately for the patient, and with the immediate response of two or three Christian Science nurses.

AR 105. Also in June 2012, CHBA summarized Mrs. Summersgill's care:

> As seen from the care plans and rationales over the past couple of years, Mrs. Summersgill needs specific, skilled care with mobility, nourishment, and responding to sudden needs and changing needs that arise . . . . When turning her for care or settling, we need to give defined, cradled support at her head and neck and full, even support at her back and legs to ensure care that will not give further challenges with breathing or other challenges associated with difficulty with freedom of movement with her head and neck . . . . Mrs. Summersgill also has very specific nourishment needs due to difficult with breathing and chewing . . . . Quite a few times over the past couple of years, and especially in the last year, there have been instances where the patient has been challenged with an obvious change of temperature, vomiting, and/or extreme slowness of breath or irregular breathing.

AR 174.

As set forth in the Plan, Medicare coverage was the primary coverage and the Plan provided secondary coverage. AR 630; D. 102 ¶ 16. From January 1, 2010 through March 31, 2010, Medicare, as the primary coverage, paid CHBA $69,589 for Mrs. Summersgill's care. D. 102 ¶

17.  During that same period, Aetna paid CHBA, after deductibles, $2,601 as secondary coverage. Id. ¶ 18; AR 44, 111-12.  By March 31, 2010, Mrs. Summersgill's Medicare benefits were exhausted and the Plan became the primary coverage.  D. 102 ¶ 19.  Thereafter, DuPont ultimately denied claims for Mrs. Summersgill's care at CHBA on the basis that it was custodial, not medically necessary or because insufficient clinical information was provided.  D. 96 ¶¶ 43-44, 71-72, 96; D. 102 ¶¶ 25-27.

While the parties dispute whether Summersgill exhausted administrative remedies for certain claims by properly submitting reimbursement claims to receive a final response from DuPont, they agree exhaustion has occurred for claims for the following time periods:  April 2010, September 1, 2010 through February 28, 2011 and July 2011.  D. 102 ¶¶ 21-22; D. 99 at 9-10. Claims for these months total $162,216, primarily for room and board and "patient convenience items" at CHBA at about $20,000 a month.  See AR 30, 115, 121 125, 127, 502.  As reflected in the administrative record, they are the only claims subject to a final decision by DuPont.

### 1. *Claims for April 2010*

Following Aetna's denial of the April 2010 claim for benefits and a Level 1 appeal, Mrs. Summersgill appealed to the DuPont Appeals Committee ("Appeals Committee") which reviewed the appeal.  AR 1-5; D. 96 ¶ 39.  The Appeals Committee's review included the opinion of DuPont's Medical Director, Dr. Strocko, who recommended denial of the appeal with reference to the Milliman Care Guidelines and Aetna CPB # 0201 – Skilled Home Health Care Nursing Services.  AR 1-5.  In recommending denial, Dr. Strocko noted:

> The only document that discusses the patient's condition is the CHBA Utilization Review Committee that states on 2/23/10 the patient exhibited weakness, difficulty chewing and swallowing, pain on moving and difficulty speaking. There are also 2 letters, dated 9/15/11 and 11/10/11, from the son stating the family does not feel

capable of providing the skilled nursing care at home that Aetna requires. There are no ongoing nursing or progress notes, no repeated evaluations or clinical observations and no details that support the need for continued inpatient nursing care.

AR 5.

On December 16, 2011, the Appeals Committee denied the appeal based on Section X.9 of the Plan and the SPD which specifically exclude "charges for services or supplies not medically necessary or appropriate for the diagnosis and treatment of the illness or injury, except for preventative procedures described herein" and that the record did not indicate the need for continued inpatient nursing care.  AR 1.

### 2. Claims for September 1, 2010 through February 28, 2011

Aetna denied claims for benefits and Level 1 appeals for September 1, 2010 through February 28, 2011, AR 152-56, based on the reviews and recommendations of Dr. Joseph W. Kozachek, board certified in internal medicine and rheumatology, AR 109, and Dr. Philip Waldor, board certified general surgeon, AR 110.

Following Mrs. Summersgill's appeal to DuPont, the Appeals Committee received the opinion of an independent medical expert at Independent Medical Consulting Service, Inc., board certified in internal medicine and nephrology and a member of the American Board of Quality Assurance and Utilization Review Physicians.  AR 131-32.  On August 6, 2012, upon review of the appeal, including the opinion from the independent medical expert, the Appeals Committee denied Mrs. Summersgill's claims based on Section X.14 of the Plan and the SPD which exclude custodial care.  AR 99.  The Appeals Committee concluded:

> The services were custodial in nature; therefore, the Benefit Appeals Committee has determined that the claims were denied properly in accordance with the plan's terms and conditions and your request to have these services covered is denied.

Id.

### 3. *Claims for July 2011*

Aetna denied a claim for benefits and a Level 1 appeal for July 2011.  AR 550-54.  Aetna based its denial on a clinical review assessment from Dr. Stanley Chaplin, board certified in obstetrics and gynecology, who recommended denial because Mrs. Summersgill care was custodial and not medically necessary, AR 487.  Aetna's denial was also based on a clinical review assessment from Dr. Joseph Kozachek, board certified in internal medicine, AR 486, who recommended denial, stating:

> The information received does not show that the member meets any of the following for this level of care:  there was inadequate day by day review of the membeers [sic] condition to confirm that the member met the skilled care needs as defined either by standard Christian Science practice or using the allopathic definition of skilled care. The actual interventions performed to support airway maintenance were not adequately described to confirmt [sic] that these were skilled in nature, and the other supporting care would be custodial in nature and excluded from coverage under this members [sic] plan. Further treatment of this member could be provided in another setting, such as an outpatient setting or home.

Id.

Mrs. Summersgill appealed to DuPont and the Appeals Committee reviewed the appeal. AR 481-84.  The Appeals Committee received the opinion of an independent medical expert at Independent Medical Consulting Service, Inc., board certified in internal medicine, who recommended denial because the care Mrs. Summersgill received was custodial.  AR 483-84, 507-09.  On November 2, 2012, upon review of the appeal, including the opinion of the independent medical expert, the Appeals Committee denied Mrs. Summersgill's claims based on Section X.14 of the Plan and the SPD which exclude custodial care.  AR 481.  The Appeals Committee concluded:

8

The services were custodial in nature; therefore the Benefit Appeals Committee has determined that the claims were denied properly in accordance with the plan's terms and conditions and your request to have these services covered is denied.

Id.

### III.   Procedural History

On February 14, 2013, Summersgill filed a complaint challenging Defendants' denial of health insurance benefits for Mrs. Summersgill's care at CHBA.  D. 1.  The complaint brought claims for reimbursement of the expenses Mrs. Summersgill incurred at CHBA pursuant to 29 U.S.C. § 1132(a)(1)(B) (Count I), attorneys' fees and costs under 29 U.S.C. § 1132(g) (Count II), breach of fiduciary duty (Count III), breach of contract (Count IV), misrepresentation (Count V) and for unfair and deceptive acts under Mass. Gen. L. c. 93A & 176D (Count VI).  Id.  Upon consideration of the Defendants' motions to dismiss, D. 12; D. 17; D. 37, the Court issued a Memorandum and Order on March 18, 2014.  D. 41.  In that Order, the Court dismissed Counts III through VI as to all Defendants.  Id.  Shortly thereafter, Summersgill, with leave of the Court, filed an amended complaint excluding the dismissed counts, D. 63, and Defendants answered, D. 68-70.  DuPont filed the administrative record with the Court, D. 105, and Defendants and Summersgill each moved for summary judgment, D. 88; D. 92; D. 94.  On December 23, 2015, the Court heard oral argument on the motions and took them advisement.  D. 106.

### IV.   Discussion

####    A.  Standard of Review

In an ERISA benefits case, "where review is based only on the administrative record before the plan administrator . . . summary judgment is simply a vehicle for deciding the issue," Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 517 (1st Cir. 2005), and not a screening mechanism

for trial.  The Court "sits more as an appellate tribunal than as a trial court" and "evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary."  Leahy v. Raytheon Co., 315 F.3d 11, 18 (1st Cir. 2002).  As such, "the factual determination of eligibility for benefits is decided solely on the administrative record, and 'the non-moving party is not entitled to the usual inferences in its favor.'"  Bard v. Boston Shipping Ass'n, 471 F.3d 229, 235 (1st Cir. 2006) (quoting Orndorf, 404 F.3d at 517).

### B.  Aetna as Fiduciary

Aetna moves for summary judgment on the basis that it is the wrong party as to the remaining counts for the allegedly wrongful denial of Mrs. Summersgill's reimbursement claims. D. 93 at 1-2.  This Court previously denied Aetna's motion to dismiss based on the same ground because, at that stage, it was unclear whether Aetna "control[s] administration of the Plan." Summersgill v. E.I. Dupont de Nemours & Co., No. 13-cv-10279-DJC, 2014 WL 1032732, at *7 (D. Mass. Mar. 18, 2014).  As discussed when denying Aetna's motion:

> ERISA contemplates actions against an employee benefit plan and the plan's fiduciaries . . . .  Courts have determined that when the plan administrator retains discretion to decide disputes, a third party service provider . . . is not a fiduciary of the plan, and thus not amenable to a suit under § 1132(a)(1)(B) . . . .  Thus, "[t]he proper party defendant in an action concerning ERISA benefits is the party that controls administration of the plan."

Id. (quoting Terry v. Bayer Corp., 145 F.3d 28, 35–36 (1st Cir.1998)).  Based on the administrative record now before the Court, including the Plan, SPD and Administrative Agreement, Aetna has "amply demonstrated" that DuPont "retained—by written instrument—the discretion to decide disputed claims."  Terry, 145 F.3d at 36.  DuPont, in fact, exercised its discretion when, upon review by its Appeals Committee, it denied the final appeal for Mrs. Summersgill's care for certain months.  AR 1-5, 99, 104-107, 481-84.  Here, because DuPont retained the discretion to decide

"final appeals," Aetna—the Claims Administrator who applied the terms of the Plan and SPD as written to Mrs. Summersgill's claims—is not a fiduciary of the Plan, and thus not amenable to a suit under § 1132(a)(1)(B).  See Terry, 145 F.3d at 35-36.  Accordingly, the Court allows Aetna's motion for summary judgment.

### C.  Claims Properly Before the Court

It is well established that "[a]s a prerequisite to bringing a suit to recover benefits, a claimant must exhaust the administrative remedies available under her ERISA plan."  Pingiaro v. Standard Ins. Co., 986 F. Supp. 2d 96, 102 (D. Mass 2013) (citing Terry, 145 F.3d at 40; Drinkwater v. Metro. Life Ins. Co., 846 F.2d 821, 825-26 (1st Cir.1988)).  As discussed, the Plan and SPD require a beneficiary who disagrees with Aetna's determination of benefits to file a final appeal with DuPont and receive a final decision to exhaust administrative remedies.  AR 686-87. The parties agree that the administrative record before the Court only includes final decisions from DuPont regarding claims for three time periods described above: April 2010, September 1, 2010 through February 28, 2011 and July 2011.  D. 100 at 3; D. 104 at 2.

While Summersgill argues that the administrative record is incomplete by failing to include documentation of appeals (primarily with Aetna) for other months, D. 90 at 11-13; D. 99 at 9-12; D. 100 at 3, only final decisions by DuPont, the party who retains the discretion to resolve disputes regarding the Plan's coverage, are reviewable by the Court, see Pingiaro, 986 F. Supp. 2d at 102. As such, the administrative record properly includes "only the documents relevant to the appeals to Dupont, not other correspondence with Aetna."  D. 104 at 2.  Additionally, Summersgill appears to have sent numerous typed letters and faxes to Aetna and DuPont regarding claims for Mrs. Summersgill's care at CHBA, see, e.g., AR 6, 72-79, 134-36, 142-45, 160-61, 218, 561-63, yet

has made no effort to supplement the record in this regard.[5]   Although Summersgill expresses frustration with the claims and appeals process with Aetna and DuPont, D. 90 at 11-13, he does not argue (or demonstrate) that administrative exhaustion would be futile, especially where he successfully exhausted claims for coverage for the time periods enumerated above.  See Pingiaro, 986 F. Supp. 2d at 103 (discussing plaintiff's failure to invoke the futility exception to the administrative exhaustion requirement).  Accordingly, the Court's review is limited to those claims for April 2010, September 1, 2010 through February 28, 2011 and July 2011.  D. 100 at 3; D. 104 at 2.

### D.  Denial of Coverage

#### 1. *Arbitrary and Capricious Standard of Review*

The parties do not dispute that the deferential "arbitrary and capricious" standard of review applies because the Plan delegates the discretion to construe the Plan and evaluate claims to DuPont.  D. 90 at 5-6; D. 93 at 2-3; D. 95 at 16; see Niebauer v. Crane & Co., 783 F.3d 914, 922-23 (1st Cir. 2015).   Under this standard, the Court "asks whether a plan administrator's determination is plausible in light of the record as a whole, or, put another way, whether the decision is supported by substantial evidence in the record."  Niebauer, 783 F.3d at 923 (quoting Colby v. Union Sec. Ins. Co. & Mgmt. Co. for Merrimack Anesthesia Assocs. Long Term Disability Plan, 705 F.3d 58, 61 (1st Cir. 2013)).  As such, "the court is not to substitute its

---

[5] The Court notes that Summersgill requested leave to conduct discovery primarily regarding "how Aetna and DuPont evaluate claims for Christian Science care," D. 54 at 1-2, which the Court denied, D. 61.  The Court did not agree that Summersgill's proposed "interrogatories and document requests [were] narrowly tailored or that the Plaintiff [had] made a showing to overcome the 'strong presumption' that the record on judicial review of an ERISA matter is the record that was before the administrator."  Id. (citing Liston v. UNUM Corp. Officer Severance Plan, 330 F.3d 19, 23 (1st Cir. 2003)).

judgment for that of the [administrator]." <u>Bonanno v. Blue Cross & Blue Shield of Massachusetts,</u> <u>Inc.</u>, No. 10-cv-11322-DJC, 2011 WL 4899902, at *8 (D. Mass. Oct. 14, 2011) (quoting <u>Motor</u> <u>Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983)) (internal quotation marks omitted). "Evidence is substantial if it is reasonably sufficient to support a conclusion, and the existence of contrary evidence does not, in itself, make the administrator's decision arbitrary." <u>Gannon v. Metro. Life Ins. Co.</u>, 360 F.3d 211, 213 (1st Cir. 2004) (citation omitted). In essence, the Court must decide only whether the administrator's denial of benefits was irrational, resolving any doubts in favor of the administrator. <u>See</u> <u>Liston v. Unum Corp.</u> <u>Officer Severance Plan</u>, 330 F.3d 19, 24 (1st Cir. 2003).

2. *DuPont's Decision To Deny Coverage Was Not Arbitrary and Capricious*

Whether DuPont acted unreasonably in denying Mrs. Summersgill benefits under the Plan is guided by the terms of the Plan itself. As such, according to the Plan, a beneficiary is entitled to "unlimited days for room and board and nursing care" at a Christian Science Facility "in lieu of inpatient hospital care." AR 626; <u>see</u> AR 671. In providing such coverage, DuPont ultimately has the discretion and authority to interpret the Plan, resolve ambiguities and evaluate claims, which includes consultation with health care professionals. AR 635, 688.

In denying Mrs. Summersgill's claims, DuPont interpreted the Plan to provide coverage for room and board and nursing care at a Christian Science facility in the event a beneficiary has a condition that would otherwise require an inpatient hospital stay. D. 95 at 18; D. 104 at 3-4. That is, for the nursing care at a Christian Science facility to be "medically necessary," it must be treating an "illness or injury" which requires such care. AR 617, 699. DuPont's interpretation does not, as Summersgill suggests, D. 99 at 2-3, read out of the Plan coverage for all care at a

Christian Science facility.  Rather, it simply requires that a beneficiary have a condition that would

otherwise need inpatient hospital care.  Likewise, if a beneficiary is receiving care at a Christian

Science facility, but has no illness or injury which would require medically necessary treatment,

the care provided would be "custodial" and not covered by the Plan.  AR 617, 698.  Care is also

deemed custodial under the Plan if a beneficiary has "reached the maximum level of recovery

which can reasonably be expected."  AR 617, 698.  Thus, absent an illness, injury or a reasonable

expectation of improvement, care is "primarily for purposes of meeting a person's needs which

could be provided by persons without professional skill or training."  Id.  As described by DuPont,

"[t]he Plan does not cover custodial or not medically necessary care, whether offered by an

allopathic or Christian Science facility."  D. 95 at 18.

DuPont's interpretation of the Plan's coverage of care and treatment in a Christian Science

facility is substantially similar to Medicare's coverage of religious nonmedical healthcare

institutions ("RNHCIs").[6]  See generally Children's Healthcare Is a Legal Duty, Inc. v. Min De

Parle, 212 F.3d 1084 (8th Cir. 2000) ("Children's Healthcare") (discussing Medicare coverage of

RNHCIs in the context of a constitutional challenge).  As explained by the Eighth Circuit in

Children's Healthcare, a case relied upon by both parties:

> . . .  Medicare and Medicaid payments may be made for "services furnished an
> individual in [an RNHCI] *only* if the individual has a condition such that the
> individual would qualify for benefits . . . if the individual were an inpatient or
> resident in a hospital or skilled nursing facility that was not [an RNHCI]."  42
> U.S.C. § 1395i–5(a)(2) (emphasis added).  Thus, an RNHCI patient whose illness
> is such that he would have received skilled care if he were at a medical institution
> may be reimbursed for the nonmedical services he receives at an RNHCI because,
> had he attended a medical facility, he would have been reimbursed for such services

---

[6] A notable distinction is that Medicare provides coverage for custodial care when given "as a part
of an integrated plan of care that, as a whole, requires professional supervision."  Children's
Healthcare, 212 F.3d at 1096.

as part of an aggregate plan of skilled care.  *See* 42 C.F.R. § 409.33(a)(1).  If, however, the patient's illness would not require services sufficiently complex to be deemed skilled care if he were at a medical facility, the patient would not be entitled to any Medicare benefits, just as a medical institution patient would not be so entitled.

Id. at 1097 (brackets in the original).

While DuPont uses the example of a broken bone to illustrate how coverage work under the Plan at a Christian Science facility, D. 95 at 18; D. 104 at 3-4, the Eighth Circuit used a more general example:

> Suppose, for example, that two patients with similar health problems sought care at the facilities of their choice, with A attending a medical institution, and B an RNHCI. While at their respective institutions, both A and B receive the same basic physical nursing services, such as changing of bed pans and assistance with eating and bathing. A, however, receives these services along with medical services as part of an integrated plan of skilled care that requires professional supervision, while B receives only the nonmedical care services.  Under the Medicare Act, A would be reimbursed for both the medical and the nonmedical services.  Under section 4454, B, who had the very same condition as A, would also be reimbursed, although only for the limited, nonmedical care that he received.

Children's Healthcare, 212 F.3d at 1097.

Considering the language of the Plan, the Court concludes that DuPont's interpretation of the Plan regarding coverage for Christian Science care is plausible.  Thus, the essential question in determining whether DuPont acted arbitrarily and capriciously in denying coverage is whether Mrs. Summersgill had an injury or illness requiring inpatient hospital care—care that was medically necessary—despite being treated by Christian Science nurses at CHBA for the injury or illness.  According to the recommendations of numerous health care professionals considered by Aetna and DuPont in evaluating Mrs. Summersgill's claims for benefits, and based on the information provided to them by CHBA, the answer was "no."  Reviewing the administrative

record, the Court concludes that DuPont's final decision to deny coverage because Mrs. Summersgill's care was not medically necessary or custodial is supported by substantial evidence.

Based upon the information provided by CHBA regarding Mrs. Summersgill's condition during her time at CHBA, including CHBA's letters and Christian Science nursing notes, Mrs. Summersgill had issues with temperature, vomiting, shortness or irregular breath, feeding and movement.  AR 31-33, 105, 174, 294-444, 569.  Although CHBA asserts that, based on these issues, Mrs. Summersgill required "care at a high complexity level," AR 174, and would have "require[d] hospitalization were she not treated at [CHBA]," AR 32, standing alone, this does not render unreasonable DuPont's conclusion that Mrs. Summersgill's issues did not constitute an illness or injury requiring medically necessary inpatient care at a hospital.  Indeed, DuPont's conclusion was supported by substantial evidence based on the recommendations of various health care professionals who reviewed and considered the submissions from CHBA.

As highlighted by DuPont, D. 95 at 18; D. 104 at 5, Mrs. Summersgill's issues were also indistinguishable from those experienced by many other elderly individuals as a part of the aging process.  While Summersgill asserts that in Christian Science "healing (full recovery) is ALWAYS the expectation," AR 72, 79, 161 (emphasis in the original), under the Plan, custodial care includes "treatment of persons who have reached the maximum level of recovery which can reasonably be expected" and all care must be medically necessary, AR 617, 670.  Summersgill or CHBA does not distinguish Mrs. Summersgill's issues from those caused by advanced age and thus Mrs. Summersgill's ongoing care for those issues—separate from the care for an injury or illness— whether in a hospital or at a Christian Science facility, could not be reasonably expected to improve her condition and was therefore custodial.  As noted by DuPont, "Mrs. Summersgill's treatment

16

status had not improved, and in fact had not changed for nearly a year." D. 101 at 5. As such, the Court concludes that DuPont's denial of coverage because Mrs. Summersgill's care was custodial was not arbitrary and capricious and supported by substantial evidence.

Summersgill argues, however, that because Christian Science does not employ typical medical diagnostic techniques, there were no medical records for DuPont to rely upon in making a coverage determination, rendering any decision by DuPont unreasonable. D. 90 at 7-8. In a similar vein, Summersgill also objects to the use of the Milliman Care Guidelines in evaluating Mrs. Summersgill condition because they make no mention of Christina Science care. Id. The Court rejects these arguments for two reasons.

First, there are Christian Science care records for DuPont's medical professionals to make a determination about coverage under the Plan. DuPont argues that Summersgill's reasoning would mean that any claim by a beneficiary receiving care at a Christian Science facility would have to be covered under the Plan because such a facility does not create medical records for DuPont to review. D. 104 at 3-4. A Christian Science facility, however, is not wholly without a means of providing DuPont enough information about a beneficiary's issues for a claim to be approved. According to the "Christian Science Nursing Overview," a nurse does not provide a medical diagnosis, but does "evaluate" various aspects of a patient's needs. AR 61. Likewise, "Christian Science Nursing A Quality Assessment Tool," covering "the main aspects of the Christian Science nursing, including . . . the assessment process," AR 62, discusses how a Christian Science nurse charts the patient's care, develops a care plan, documents the care needed by the patient, AR 64, discerns when a patient requires assistance, AR 66, and keeps track of a patient's

17

nourishment, AR 67.[7]  Such Christian Science nursing records, consisting simply of a description of care, would be available for review, as they were here, for a determination of coverage under the Plan.  Here, CHBA provided to DuPont Mrs. Summersgill patient care plan, AR 281-293, and daily nursing records, AR 294-444, indicating Mrs. Summersgill's issues with temperature, feeding and mobility.  As discussed, care for those issues did not indicate a condition requiring inpatient care and thus DuPont did not unreasonably deny coverage.

Second, the SPD explicitly states that "[a]ll care must be medically necessary," regardless of whether a beneficiary receives care at a hospital or a Christian Science facility.  AR 670. Accordingly, DuPont must determine medical necessity in determining coverage and, therefore, must use some criteria (e.g., Milliman Care Guidelines or the expertise of a medical professional) in making a reasonable decision in that regard.  As recognized by another court, because the Milliman Care Guidelines, standing alone, did not control DuPont's decision, the Court cannot deem the decision "arbitrary and capricious simply because Milliman's Care Guidelines [were] considered in the analysis."  Becker v. Chrysler LLC, Health Care Benefit Plan, No. 09-cv-344-WCG, 2011 WL 2601254, at *6 (E.D. Wis. June 30, 2011), aff'd sub nom., Becker v. Chrysler LLC Health Care Benefits Plan, 691 F.3d 879 (7th Cir. 2012).  Notably, the SPD contemplates the use of "a health care professional who has appropriate training and expertise in the field of medicine involved in the medical judgment" in determining medical necessity or custodial care, AR 688, and that professional may reasonably use the Milliman Care Guidelines in coming to his or her conclusion.  Summersgill, while disagreeing with the use of the Milliman Care Guidelines,

---

[7] The Christina Science Quality Assessment Tool states that care plans and "patient records (charts)" document the care given and do not include a record of symptoms or conditions.  AR 64.

does not point to any language in the Plan suggesting that DuPont must apply Christian Science care guidelines in making a coverage determination.

In sum, the information CHBA provided regarding Mrs. Summersgill's issues and the care she received did not indicate that she required care at the CHBA "in lieu of inpatient hospital care" such that the care she received was medically necessary or not custodial. Thus, DuPont, based on substantial evidence, did not act arbitrarily or capriciously in denying coverage for Mrs. Summersgill's claims for April 2010, September 1, 2010 through February 28, 2011 and July 2011 that are properly before the Court for review.

**V.   Conclusion**

For the reasons above, Summersgill's motion for summary judgment, D. 88, is DENIED, Aetna's motion for summary judgment, D. 92, is ALLOWED and DuPont's motion for summary judgment, D. 94, is ALLOWED.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge